```
                                              ┌─────────────────────────────────┐
                                              │ USDC SDNY                        │
                                              │ DOCUMENT                         │
                                              │ ELECTRONICALLY FILED             │
UNITED STATES DISTRICT COURT                  │ DOC #: _____           │
SOUTHERN DISTRICT OF NEW YORK                 │ DATE FILED: May 6, 2014          │
------------------------------------------X   └─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

OKSANA BAIUL,                             :
                                          :
                     Plaintiff,           :            13 Civ. 8683 (KBF)
          -v-                             :
                                          :            OPINION & ORDER
                                          :
WILLIAM MORRIS AGENCY, LLC, et al.,       :
                                          :
                     Defendants.          :
                                          :
----------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

Before this Court is another lawsuit—against numerous and myriad

defendants[1]—brought by Oksana Baiul ("plaintiff" or "Baiul") that seeks millions of

dollars in damages for events that took place in the 1990s.[2]  This suit alleges a

sweeping conspiracy spanning more than two decades by more than 20 individuals

and entities to steal tens of millions of dollars from Baiul that she earned during

the course of performances, endorsements, and other business ventures.  The suit is

frivolous and, frankly, bizarre.

For the reasons set forth below, this suit is also wholly without merit,

defendants' motions to dismiss are GRANTED, and this action is DISMISSED.

---

[1] The Court notes that, as discussed herein, the manner in which Baiul pleads this action appears to be little more than an attempt to avoid paying separate filing fees for separate actions against each defendant or group of defendants.  See Digital Sins, Inc. v. John Does 1-245, No. 11 Civ. 8170 (CM), 2012 WL 1744838, at *3 (S.D.N.Y. May 15, 2012) ("The only economy that litigating these cases as a single action would achieve is an economy to plaintiff—the economy of not having to pay a separate filing fee for each action brought.").

[2] In an Opinion & Order dated April 24, 2014, this Court granted motions for summary judgment dismissing two other suits brought by Baiul also seeking millions of dollars in damages.  See Baiul v. NBCUniversal Media, LLC et al., 13 Civ. 2205, ECF No. 87; Baiul et al. v. Disson et al., 13 Civ. 2208, ECF No. 59.

## I.    PROCEDURAL BACKGROUND

On October 8, 2013, Baiul filed this action in New York State Supreme Court,

New York County, for, <u>inter alia</u>, violations of the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1961 <u>et seq.</u>, and claims for fraud, breach of

contract, breach of fiduciary duty, and conversion.  (Notice of Removal, Ex. 1, ECF

No. 1.)[3]  The action was properly removed by certain defendants on December 6,

2013.  (<u>Id.</u> ¶¶ 10-15.)[4]

Following the filing of motions to dismiss the amended complaint by certain

defendants, on January 29, 2014, Baiul filed the Second Amended Complaint

("SAC") without leave of the Court and in violation of Rule 15(a).  (ECF No. 106.)

Nevertheless, the Court allowed filing of the SAC in light of defendants' stated

consent.  (<u>See</u> ECF Nos. 107, 108, 113.)

Four sets of defendants subsequently filed motions to dismiss the SAC for

failure to state a claim—(1) defendants Key Brand Entertainment, Inc., ("KBE"),

and Michael Rosenberg and Nancy Rosenberg (the "Rosenbergs") (collectively, the

"KBE Defendants"); (2) defendants Olympic Champions Ltd. (Delaware), Olympic

Champions Ltd. (BVI), Galina Zmievskaya, Nina Petrenko, Joseph Lemire, and

Victor Petrenko (collectively, the "Olympic Defendants")[5]; (3) defendant Screen

---

[3] Baiul filed an amended complaint in New York Supreme Court, on October 28, 2013, which
asserted substantially similar claims.  (<u>Id.</u> Ex. 2.)

[4] On January 6, 2014, Baiul moved to remand the action back to New York Supreme Court, pursuant
to 28 U.S.C. § 1447(c), on the grounds that all defendants had not timely consented to removal.  In a
Memorandum Decision & Order dated February 3, 2014, this Court denied the motion as "baseless."
(<u>See</u> 2/3/14 Mem. Decision & Order at 6-7, ECF No. 114.)

[5] Baiul alleges that defendants Ukrainian Financial Group JSC, PJSC Gala Radio, and Babich are
affiliated with one or more of the Olympic Defendants.  (<u>See</u> SAC ¶¶ 39-40, 47-48, 51-52.)  Though it
is unclear from the docket whether service of these defendants has been completed, for the reasons

2

Actors Guild-American Federation of Television and Radio Artists ("SAG" or "the Union"); and (4) defendants 1898 Holdings, LLC (f/k/a William Morris Agency, LLC ("WMA")), William Morris Endeavor Entertainment, LLC ("WMEE"), Sheldon Shultz, Michael Carlisle, James Griffin, Alan Dworkin, and Richard Hersh (collectively, the "WMEE Defendants"), and defendants Wallin Simon & Black, Patricia Black, and Alan Suskind (collectively, the "Accounting Defendants").[6]

Baiul opposed each of the four motions by March 19, 2014, and the motions became fully briefed on April 8, 2014.

## II.    FACTUAL ALLEGATIONS

Baiul is a Ukrainian-born figure skater who won the 1993 World Championship and the Olympic Gold Medal at the Winter Olympics in February 1994 in Ladies Figure Skating. (SAC ¶¶ 65, 69.) Since these performances, she has allegedly appeared in "innumerable" television, film, and stage productions, has appeared in advertisements, has authored two books, and has promoted fashion and jewelry lines. (Id. ¶ 68.) Baiul was born on November 16, 1977 and moved from the Ukraine to the United States in 1994; at that time, she alleges that she was a minor who was not able to speak, read, or understand English. (Id. ¶¶ 69, 96, 100, 126.)

Baiul alleges the formation of a "criminal enterprise" around the time she won the 1993 World Championship—she has named the enterprise "Promises

---

set forth herein with respect to Baiul's claims against the Olympic Defendants, her claims against these defendants are also dismissed as untimely.

[6] In its February 3, 2014 Memorandum Decision & Order, the Court dismissed defendant Alan Wallin from this action in light of the fact that Wallin passed away more than nine years before Baiul filed this action. (See 2/3/14 Mem. Decision & Order at 4-5.)

Broken."[7]  Baiul alleges this "organization" included or associated with, inter alia,
defendants; the object of the enterprise is alleged to be stealing money from and
"exploiting" her without her knowledge, "in keeping with the standard operating
procedure for post-Soviet criminal enterprises."  (Id. ¶¶ 64, 77-93, 111, 123, 126,
130-33.)  Beginning in 1993, Baiul alleges that various individuals, including
certain Olympic Defendants, held positions in Promises Broken, and that the money
stolen from Baiul was transferred into their accounts.  (Id. ¶¶ 78-86, 89.)

     The SAC primarily focuses on a four-year period from 1993 through 1997,
during which time Baiul signed various agreements and alleges defendants stole
more than $57 million from her.  Baiul alleges that she "exclusively relied upon one
or more persons associated with Promises Broken for business decisions including
the interpretation" of the various agreements she signed and reviewed.  (Id. ¶ 263;
Baiul Aff. ¶¶ 2, 7, ECF No. 158.)

     On or about May 9, 1994, Baiul entered into several contracts with WMA
(now known as 1898 Holdings, LLC, a WMEE Defendant), which granted WMA the
exclusive right to represent her in all fields and media throughout the world, the
right to collect monies on her behalf, and set forth deductions for commissions and
other compensation for services.  (SAC ¶ 135.)  At the time, Baiul was 16 years old.
(Id. ¶ 126.)  Also on or about May 9, 1994, WMA signed various agreements with
the Olympic Defendants and others, which appointed WMA as Baiul's sole agent

---

[7] The SAC does not allege any defendant (or anyone else) actually referred to this alleged
organization as "Promises Broken"; rather, this term appears to be word play by Baiul's attorney
related to the title of a movie ("A Promise Kept: The Oksana Baiul Story") in which Baiul appeared.
(See SAC ¶ 284.)

4

with respect to her services in the entertainment industry and established terms and conditions of compensation among the parties for certain of Baiul's services. (Id. ¶ 136.) Baiul renewed the agreement with WMA on May 9, 1997, when she was 19 years old. (Id. ¶¶ 126, 249.)

In 1993 and 1994, the KBE Defendants and the Olympic Defendants are alleged to have stolen more than $1 million that Baiul should have been paid in connection with her performances in the "Tom Collins Shows." (Id. ¶¶ 113-16, 137-52.) In 1994, WMA transferred no less than $190,000 that belonged to Baiul to settle a dispute between, inter alia, the Olympic Defendants and the KBE Defendants, which resulted in the KBE Defendants being "expelled" from Promises Broken at that time. (Id. ¶¶ 155-58, 168-72, 182-83.)

The Olympic Defendants are alleged to have stolen compensation Baiul may have received in 1994 as a result of training at the International Skating Center in Connecticut, as well $40,000 that was later used to purchase a license for defendant Gala Radio in the Ukraine. (Id. ¶¶ 99-110, 158-160.) The SAC alleges that Lemire, as well as other defendants who are alleged to be affiliated with Lemire, stole $15 million from Baiul in the Ukraine from 1993 to the present.[8] (Id. ¶¶ 167, 452, 463.)

Baiul alleges that the WMEE Defendants and the Olympic Defendants diverted compensation Baiul should have received from the movie A Promise Kept: The Oksana Baiul Story ("A Promise Kept") to either themselves or to Petrenko and

---

[8] The SAC does not provide any further detail as to the dates or itemization of this alleged $15 million theft.

Zmievskaya individually, in 1994—in total, more than $500,000, whereas Baiul alleges she was "never paid" for her work on the movie. (Id. ¶¶ 301-27.) Baiul alleges that WMEE "should still be collecting royalties" for the movie and transferring them to her. (Id. ¶¶ 328-29.)

Baiul alleges that she performed in two Nutcracker on Ice shows in late 1994, but was not told how much she was being paid; according to the SAC, she was told that she would be performing in those shows by certain of the Olympic Defendants. (Id. ¶¶ 201-03.) Baiul alleges that the Olympic Defendants and the WMEE Defendants either withheld compensation or diverted compensation to Petrenko for these shows. (Id. ¶¶ 352-60, 376-84.) Baiul alleges that the certain WMEE Defendants stole money that she earned from performing in a Wizard of Oz on Ice show in 1995, telling her at the time that she made $25,000 when in actuality she made $350,000. (Id. ¶¶ 205-12, 428-36.)

Baiul alleges that she is owed money from a merchandising agreement with Sony Signatures from 1994 that was executed by the WMEE Defendants and the Olympic Defendants that provided for, inter alia, a $100,000 advance as well as other royalties. (Id. ¶¶ 400-25.) Baiul alleges a wire transfer related to this agreement from WMEE to Olympic Champions Ltd. in March 1995. (Id. ¶ 415.)

Additionally, Baiul alleges that WMEE paid millions of dollars to individuals associated with Promises Broken and not to her for other promotional work and business ventures, including $150,000 for the Oksana Baiul Jewelry Collection, millions of dollars for a Snickers endorsement campaign, royalties for two

6

"bestseller" books, and more than $21 million related to an October 1995 Health Rider infomercial. (Id. ¶ 450.)

Baiul alleges it was her belief that, "due to an unrelated dispute," she severed all ties with the Olympic Defendants in January 1997. (Id. ¶ 184.)

Certain of the Accounting Defendants were hired to handle Baiul's business affairs, financial affairs, and tax returns in March 1997. (Id. ¶ 195.) Baiul alleges that the Accounting Defendants continuously represented her as her accountants from 1997 through 2012. (Id. ¶ 454.) Baiul alleges, generally, that the Accounting Defendants covered up, destroyed evidence of, concealed, and otherwise failed to inform her of the other allegations of theft contained in the SAC beginning in 1994 up through the filing of this action. (Id. ¶¶ 458-59.)

Baiul alleges that the WMEE Defendants and the Accounting Defendants failed to tell her that the house in which she was living was not owned by her in March 1997, when she expressed a desire to sell the house. (Id. ¶¶ 185-99.) She further alleges that the house was owned by the Olympic Defendants until 1997, but that she did not know this fact until September 2013. (Id. ¶¶ 189, 244-45.)

Between 1997 and 2000, Baiul alleges that she was repeatedly told that everything was "great" with respect to her "business" by certain WMEE Defendants such as Schultz. (Id. ¶¶ 226-28.) Baiul alleges that she is still owed $472,500 in performance fees by Tom Collins Enterprises for a summer tour in 1998, but that WMEE failed to collect this money and instead agreed with Tom Collins to reduce her per-performance fees at that time. (Id. ¶ 460.)

Baiul alleges that she received, in 1997 and 1998, a total of nearly $1.4 million (after taxes) for the period from 1993 through 1997, which she alleges translates to a gross income of $2.8 million. (Id. ¶¶ 250-54.) Though Baiul alleges that she thought she had been "well-compensated" at the time for her work during these years, the SAC alleges that more than $57 million was stolen from her by defendants during this four-year period. (Id. ¶¶ 258, 452.) The SAC alleges that more than $62 million has been stolen from Baiul by defendants from 1993 through the date of the filing of this action. (Id. ¶ 463.)

Baiul alleges that, in 2000, she ended her contractual relationship with the WMEE Defendants; at that time, she alleges the Accounting Defendants took over "management" of Promises Broken. (Id. ¶¶ 260, 289.) During the period that WMEE represented her (1994-2000), Baiul alleges that WMEE sent her at least twenty earnings history reports ("EHRs") that she now believes to be fraudulent. (Id. ¶¶ 287, 289, 330, 368, 392, 425, 442.)

Baiul alleges that Carlo J. Farina began working as her business manager in the latter half of 2011, and that he began to investigate her royalties and residuals at that time.[9] (Id. ¶¶ 264-65.) Farina contacted defendants for documentation and explanations and, on November 19, 2011, Baiul received from WMEE a copy of her EHR for the period December 29, 1991 through December 26, 2009. (Id. ¶¶ 266-68.) Baiul alleges that, after receiving and reviewing the EHR, Farina began to

---

[9] According to the affidavit Baiul submitted in opposition to the instant motions, she is also known as "Oksana S. Baiul-Farina." (Baiul Aff. at 1.)

investigate the payments made to her by defendants during the period and uncovered discrepancies.  (<u>Id.</u> ¶¶ 274-77.)

Baiul alleges "upon information and belief" that, from on or about December 6, 2011 through May 2012, the Accounting Defendants sent her documents and accounting records that were fraudulent.  (<u>Id.</u> ¶¶ 278-280.)  Baiul also alleges "upon information and belief" that the Accounting Defendants destroyed her documents and records for 1997 in order to protect the WMEE Defendants and the Olympic Defendants.  (<u>Id.</u> ¶ 281.)  Elsewhere in the SAC, Baiul alleges that an $11,045.70 royalty paid pursuant to the Sony Signatures agreement was not on her EHR, but rather had been misfiled by the Accounting Defendants but provided to Baiul at this time.  (<u>Id.</u> ¶ 417.)  Baiul alleges that she would have "taken action sooner to recover monies owed to [her] had it not been" for these fraudulent or destroyed documents.  (<u>Id.</u> ¶¶ 281-83.)

Baiul alleges she "only discovered on or about December 2011 that A Promise Kept was subject to the SAG collective bargaining agreement."  (Id. ¶ 331.)  Baiul alleges that she is a member of SAG and, as such, she should have received "minimum compensation and pension, health and welfare contributions" and should still be receiving residuals for A Promise Kept.  (<u>Id.</u> ¶¶ 333, 337-39.)  Baiul alleges that she "never received any compensation, pension, health and welfare contributions, royalties or residuals from the producers of A Promise Kept for A Promise Kept."  (<u>Id.</u> ¶ 340.)  Similarly, Baiul alleges that the Nutcracker on Ice shows and the Wizard of Oz on Ice show in which she performed were subject to

SAG collective bargaining agreements, and she did not receive these contributions or residuals. (Id. ¶¶ 363-68, 387-93, 437-44.) With respect to the Nutcracker on Ice shows, Baiul alleges that she only discovered these facts in October 2012. (Id. ¶¶ 350, 376.)

Baiul alleges that, in October 2012, Farina determined her EHR did not include earnings from several other sources—A Promise Kept, the merchandising agreement with Sony Signatures, the Wizard of Oz on Ice show, the Health Rider infomercial. (Id. ¶ 284.) Farina also did not learn about missing earnings from the Nutcracker on Ice shows until October 2012, but Baiul alleges that she did not know if the producers for those shows might have paid somebody else for her performances other than her. (Id.) Baiul alleges that Farina informed her of each of these "discoveries." (Id.) Baiul alleges that Farina "later" realized that there was more than $5 million on her EHR that she never received from WMEE. (Id. ¶ 285.)

Baiul filed a claim with SAG for residuals from A Promise Kept on June 28, 2013. (Id. ¶ 342.) Baiul alleges that, to date, SAG has not provided her with further information respecting her claim except to indicate that residuals were paid to other actors in the movie. (Id. ¶¶ 342-43.)

III.    STANDARD OF REVIEW

On a motion to dismiss, this Court accepts as true all well-pleaded factual allegations, Ashcroft v. Iqbal, 556 U.S. 662, 678-80 (2009), and draws all reasonable inferences in lead plaintiff's favor. See Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010). To withstand dismissal, a "complaint must

10

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Thus, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era. . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678-79. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." Id. (internal punctuation omitted); see also Fed. R. Civ. P. 8(a)(2).

IV.    DISCUSSION

Though the lapse of the statute of limitations period is an affirmative defense, a defendant may raise it in a pre-answer motion to dismiss pursuant to Rule 12(b)(6) if "the defense appears on the face of the complaint." Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 426 (2d Cir. 2008) (citing McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004)).

As is made clear in the four motions to dismiss filed by defendants, the untimeliness of each of Baiul's seventeen[10] claims in her twice-amended complaint appears on its face as to all claims against all defendants. The Court notes the

---

[10] Though the SAC alleges eighteen claims, in her opposition to the WMEE Defendants' and the Accounting Defendants' motion to dismiss, Baiul states that she "does not oppose dismissal" of her claim for accounting malpractice against the Accounting Defendants (Count Seventeen). (Baiul-WMEE Opp. at 42, ECF No. 151.) Accordingly, the Court dismisses this claim.

11

assertion of such plainly time-barred claims is frivolous and raises serious Rule 11 issues.  Though many of the issues as to the timeliness of Baiul's claims are overlapping, the Court discusses each claim (or set of claims) separately.

The Court notes that each of Baiul's claims also suffers from additional fatal defects, but there is simply no reason to spend the resources to review them all in light of this glaring and dispositive issue.

A.    Civil RICO (Count One)

Baiul alleges both substantive civil RICO and conspiracy to commit civil RICO, under 18 U.S.C. §§ 1962(c), (d), and 1964(c), against all defendants with the exception SAG.  (See SAC ¶¶ 465-525.)

"The statute of limitations for a civil RICO claim under 18 U.S.C. § 1964(c) is four years." Frankel v. Cole, 313 F. App'x 418, 419-20 (2d Cir. 2009) (citing Agency Holding Corp. v. Malley-Duff & Assocs., 483 U.S. 143, 156 (1987)). "The statute of limitations is triggered when plaintiffs discover or should have discovered their RICO injury, not when they discover or should have discovered the underlying pattern of racketeering activity, even if the pattern of racketeering activity includes fraud." Frankel, 313 F. App'x at 419-20. Accordingly, the Court must determine first when Baiul sustained the alleged injury for which she seeks redress, and then when she discovered or should have discovered that injury. See In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 59 (2d Cir. 1998).

To the extent Baiul adequately alleges an appropriate civil RICO injury at all, which the Court need not reach for the purposes of deciding this motion, she

alleges that defendants stole money and other assets from her beginning in 1993 up through December 2012. (See SAC ¶ 523.) Baiul argues, in substance, that her civil RICO claim is timely because defendants fraudulently concealed their wrongdoing prior to November 2011, and that she was not on inquiry notice of the potential for fraud prior to November 2011. (See, e.g., Baiul-WMEE Opp. at 31-38, ECF No. 151.) The Court rejects this argument for two fundamental reasons.

First, Baiul was on inquiry notice of her fraud allegations as of at least 2000. "[W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir. 1983) (citing Higgins v. Crouse, 42 N.E. 6, 7 (N.Y. 1895)). The law does not require that Baiul have understood all of the nuances of the various frauds she alleges, it merely requires that she have been aware that she did not receive the earnings generated from her various performances. See Staehr, 547 F.3d at 434; Marshall v. Milberg LLP, No. 07 Civ. 6950 (LAP), 2009 WL 5177975, at *3 (S.D.N.Y. Dec. 23, 2009). "[T]he question of inquiry notice need not be left to a finder of fact" and is thus properly resolved on a motion to dismiss if it appears on the face of the complaint and any other documents the Court may consider. Merrill Lynch, 154 F.3d at 60 (citing Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350-51 (2d Cir. 1993)).

13

According to the SAC, as of 2000, Baiul had ended her relationships with the WMEE Defendants (in 2000), the Olympic Defendants (in 1997), and the KBE Defendants (in 1994). (See SAC ¶¶ 157, 184, 260.) Prior to 2000, she had been involved in numerous performances and endorsements and had signed numerous agreements, yet she alleges that she received no payments for certain undertakings (A Promise Kept, the Nutcracker on Ice shows, the Wizard of Oz on Ice show, the Sony Signatures agreement, or the Health Rider infomercial) and no payments from defendants of any kind after 1998.  She had also allegedly received more than 20 fraudulent EHRs from WMEE by 2000, which would have put a person of ordinary intelligence on notice of this alleged pattern of non-payment by defendants.  Though Baiul may have been a minor from whom English was not her primary language at the beginning of this time period, Baiul turned 18 in November 1995 and had been living in the United States for at least six years by 2000.  In light of these facts, a person of ordinary intelligence would have been on inquiry notice to further investigate potential fraud as of 2000 especially, as the SAC alleges, when defendants had failed to pay Baiul more $57 million between 1993 and 1997.

Second, Baiul may not take advantage of any tolling of the statute of limitations on the basis of fraudulent concealment (or other similar doctrines of equitable tolling under New York law) because it is clear from the face of the SAC that she did not exercise reasonable diligence to uncover the alleged fraud.

"Under federal common law, a statute of limitations may be tolled due to the defendant's fraudulent concealment if the plaintiff establishes that: (1) the

14

defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." Corcoran v. N.Y. Power Auth., 202 F.3d 530, 543 (2d Cir. 1999) (internal quotation marks and citations omitted).

Similarly, "[u]nder New York law, the doctrines of equitable tolling or equitable estoppel may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." Abbas v. Dixon, 480 F.3d 636, 642 (2d Cir. 2007) (internal quotation marks and citations omitted). "Due diligence on the part of the plaintiff in bringing [an] action, however, is an essential element of equitable relief." Id. (internal quotation marks omitted) (quoting Doe v. Holy See (State of Vatican City), 793 N.Y.S.2d 565, 569 (N.Y. App. Div. 2005)).

Plaintiffs must plead each of these elements with particularity, as is required in Rule 9(b). See Butala v. Agashiwala, 916 F. Supp. 314, 319 (S.D.N.Y. 1996) (citing cases). Plaintiffs who have not exercised reasonable diligence in trying to discover their civil RICO cause of action may not rely upon fraudulent concealment to equitably toll this limitations period. Klehr v. A.O. Smith Corp., 521 U.S. 179, 194-95 (1997).

The Court need not reach the other elements of fraudulent concealment or equitable tolling because the SAC makes clear that Baiul did not exercise

15

reasonable diligence during the period for which she seeks to toll the statute of limitations.  Though Baiul generally alleges that defendants misrepresented or concealed their alleged wrongdoing from Baiul up through the filing of the instant action, and that she would have taken action sooner to recover the money she believes she is owed if they had not, Baiul alleges no facts whatsoever to support this argument.  Baiul alleges that she first began to investigate the fraud that forms the basis of the SAC in late 2011, when she hired a new business manager (Farina) who took an interest these issues.  Baiul alleges no facts whatsoever as to why she failed to begin this same investigation in the prior eleven years since 2000—she alleges no facts as to why she could not have conducted this same investigation and requested the same documents as Farina did in 2011, or why she could not have hired someone else to do so sooner.

   To the contrary, Baiul admits to receiving regular EHRs from WMEE up through 2000, during a period when she alleges she received no payments for certain performances and endorsements and, eventually, no payments at all. Despite these allegations, Baiul does not allege in the SAC any investigation by her or her agents of these potential claims until late 2011.  See Koch v. Christie's Int'l PLC, 699 F.3d 141, 157 (2d Cir. 2012) ("Based on the undisputed fact that Koch did not pursue any investigation for over four years after receiving the Woods Hole Report, Koch did not act with reasonable diligence during that period.").  To hold that Baiul's decision to wait to conduct any investigation until late 2011 (when she hired Farina), despite being on notice of the possibility of fraud for at least eleven

years, amounts to reasonable diligence sufficient to toll the statute of limitations would render the doctrine a nullity.  Cf. Stuart v. Stuart, No. 12 Civ. 5588 (CS), 2013 WL 6477492, at *5 (S.D.N.Y. Dec. 10, 2013) ("It simply cannot be said that waiting until 2011 to look into why [defendant] had not done what he promised to do in 1998 plausibly shows reasonable diligence on Plaintiff's part.").

Baiul also argues, in substance, that whether she exercised reasonable diligence in discovering her civil RICO claim is a fact question that must be resolved by a jury.  (See Baiul-WMEE Opp. at 31-32.)  This is not the law where, as here, "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law."  Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000); see also Staehr, 547 F.3d at 425-26. According to the SAC, Baiul did not begin to investigate the alleged fraud until late 2011; prior to that date, there is no dispute that Baiul did not undertake any steps to uncover the fraud of which she was on notice as to all defendants no later than 2000.

Under the law, the statute of limitations for Baiul's civil RICO claim began to run not when Baiul determined that the harm she allegedly suffered was actionable; it runs from when she discovered or should have discovered the alleged injury.  See Frankel, 313 F. App'x at 419-20.  Because Baiul filed the instant action in October 2013, her civil RICO claim is untimely by at least nine years.

17

B.    Common Law Fraud (Counts Seven, Eight, Nine, and Ten)

Baiul asserts claims for common law fraud and misrepresentation[11] against

the WMEE Defendants and the Accounting Defendants for the alleged conduct

described above.  (See SAC ¶¶ 570-618.)

"The New York statute of limitations for a common law fraud claim is the

greater of six years from the date the cause of action accrued or two years from the

time the plaintiff . . . discovered the fraud, or could with reasonable diligence have

discovered it." Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 361 n.3 (2d Cir. 2013)

(internal quotation marks omitted) (citing N.Y. C.P.L.R. § 213(8)); see Huang v.

Siam Commercial Bank Pub. Co., 247 F. App'x 299, 301 (2d Cir. 2007) (New York

law fraud "statute of limitations begins to run six years from the commission of the

fraud or two years from discovery, whichever is longer") (citation omitted).  "[W]hile

it is true that New York courts will not grant a motion to dismiss a fraud claim

where the plaintiff's knowledge is disputed, it is proper under New York law to

dismiss a fraud claim on a motion to dismiss pursuant to the two-year discovery

rule when the alleged facts do establish that a duty of inquiry existed and that an

inquiry was not pursued." Koch, 699 F.3d at 156-57.

Like Baiul's civil RICO claim, her fraud claims concern acts (the theft of

millions of dollars in performance and endorsement earnings) that took place

between 1993 and 2000, and of which she had inquiry notice by 2000 at the latest.

(See SAC ¶¶ 581, 595, 604, 613.)  As described above, Baiul cannot avail herself of

the New York discovery rule because she has not alleged any facts whatsoever that

---

[11] There is no dispute that New York law applies to Baiul's state law claims in the SAC.

tend to show that she exercised reasonable diligence to uncover the alleged fraud until late 2011. Baiul's fraud claims are thus untimely by at least seven years.[12]

### C. Breach of Contract (Counts Two and Eleven)

Baiul alleges breach of contract against the WMEE Defendants, arising out of the May 1994 agreements and the events that followed. (See SAC ¶¶ 526-533.) Baiul also alleges breaches of the implied covenant of good faith and fair dealing against the WMEE Defendants with respect to these same agreements and her subsequent performances and endorsements pursuant to these agreements. (See id. ¶¶ 619-26.)

The statute of limitations for breach of contract claims (both express and implied) under New York law is six years. See N.Y. C.P.L.R. § 213(2); Matana v. Merkin, 957 F. Supp. 2d 473, 493 (S.D.N.Y. 2013) (citing cases interpreting New York law). "[I]n New York it is well settled that the statute of limitation for breach of contract begins to run from the day the contract was breached, not from the day the breach was discovered, or should have been discovered." ABB Indus. Sys., Inc. v. Prime Tech., Inc., 120 F.3d 351, 360 (2d Cir. 1997) (citations omitted). "The

---

[12] Baiul's state law fraud claims are also dismissed because they are duplicative of her breach of contract claims. Guilbert v. Gardner, 480 F.3d 140, 148 (2d Cir. 2007). In order for a fraud claim to survive, it must "(i) demonstrate a legal duty separate from the duty to perform under the contract, or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996) (citations and internal quotation marks omitted). Here, Baiul's fraud claims arise out of the WMEE Defendants' and the Accounting Defendants' alleged failure to disclose certain information about or pursuant to "the Baiul Agreements." (See SAC ¶¶ 578-82, 595, 604, 613.) Baiul also seeks precisely the same damages for both her fraud and breach of contract claims. (See id. ¶¶ 531-32, 586-587, 600-02, 608-10, 617-18, 625-26.)

plaintiff need not be aware of the breach or wrong to start the period running." Guilbert v. Gardner, 480 F.3d 140, 149 (2d Cir. 2007) (citations omitted).

Baiul alleges that she ended her contractual relationship with the WMEE Defendants in 2000. (SAC ¶ 260.) Even assuming that the breaches giving rise to these causes of action took place in 2000, Baiul's breach of contract claims are untimely by at least seven years.

### D.   Tortious Interference with Contract (Count Twelve)

Baiul alleges that the WMEE Defendants tortiously interfered with certain contracts she had with various advertisers, publishers, and producers. (See SAC ¶¶ 627-34.)

Under New York law, a claim for tortious interference with contract has a three-year statute of limitations. Botsas v. United States, 5 F. App'x 69, 71 (2d Cir. 2001) (citing N.Y. C.P.L.R. § 213(2)). Such a claim accrues when the injury is sustained, not when a plaintiff discovers the injury. Kronos, Inc. v. AVX Corp., 612 N.E.2d 289, 292 (N.Y. 1993).

According to the SAC, the alleged contractual interference by the WMEE Defendants necessarily precedes the termination of Baiul's relationship with WMEE in 2000. As a result, these claims are also untimely by at least ten years.

### E.   Breach of Fiduciary Duty (Counts Three, Four, Five, and Six)

Baiul alleges breach of fiduciary duty claims against the WMEE Defendants and the Accounting Defendants for the conduct described above. (See SAC ¶¶ 534-45, 560-69.) Baiul also alleges the aiding and abetting of breaches of fiduciary

duties by WMEE against the Accounting Defendants, the Olympic Defendants, and the KBE Defendants. (See id. ¶¶ 546-59.)

Because each of Baiul's claims premised on breaches of fiduciary duties seek money damages rather than equitable relief, the applicable statute of limitations is three years. See N.Y. C.P.L.R. § 214(4); Malmsteen v. Berdon, 369 F. App'x 248, 249 (2d Cir. 2010) (citing Weiss v. T.D. Waterhouse, 847 N.Y.S.2d 94, 95 (N.Y. App. Div. 2007)). "Generally, the claim accrues at the time of the breach." Malmsteen, 369 F. App'x at 249-50 (citing Kaufman v. Cohen, 760 N.Y.S.2d 157, 166 n. 3 (N.Y. App. Div. 2003)). The two-year discovery rule applicable to New York fraud claims also applies to fraud-based breach of fiduciary duty claims. Ozelkan v Tyree Bros. Envtl. Servs., Inc., 815 N.Y.S.2d 265, 267 (N.Y. App. Div. 2006).

For the reasons already discussed, Baiul's breach of fiduciary duty claims against the WMEE Defendants accrued no later than 2000 (when Baiul and WMEE terminated their relationship), and Baiul may not apply the discovery rule because she did not exercise reasonable diligence during the period she seeks to toll. Though the SAC alleges that the Accounting Defendants continuously represented Baiul as her accountants from March 1997 through 2012 (see SAC ¶ 454), it fails to allege any specific breaches of fiduciary duty within three years of the filing of this action. In fact, the conduct which forms the basis of Baiul's breach of fiduciary duty claims against the Accounting Defendants relates to alleged breaches which took place between 1994 and 2000 because they are tied to the conduct of WMEE. (See

21

id. ¶ 566.) Accordingly, Baiul's breach of fiduciary duty claims are untimely by at least ten years.

      F.      <u>Conversion (Counts Thirteen, Fourteen, Fifteen, and Sixteen)</u>

Baiul alleges conversion claims against the WMEE Defendants, the Olympic Defendants, and the KBE Defendants for the conduct described above. (<u>See</u> SAC ¶¶ 635-65.)

Under New York law, the statute of limitations for conversion is three years, N.Y. C.P.L.R. § 214(3), which begins to run "at the moment of conversion, regardless of when the conversion is discovered." <u>Lennon v. Seaman</u>, 63 F. Supp. 2d 428, 440 (S.D.N.Y. 1999) (citing <u>Vigilant Ins. Co. of Am. v. Hous. Auth. of the City of El Paso</u>, 660 N.E.2d 1121, 1126 (N.Y. 1995)).

Baiul does not allege the receipt of any funds by any defendants within three years of the commencement of this action in October 2013. In fact, the SAC alleges that Baiul ended her relationship with the WMEE Defendants in 2000, the Olympic Defendants in 1997, and the KBE Defendants in 1994. (<u>See</u> SAC ¶¶ 157, 184, 260.) Implicitly conceding this point, Baiul argues that her conversion claims are timely because the three-year limitations period did not begin to run until she made her demand—on November 19, 2011—for the return of property (the allegedly stolen funds) and that demand was refused, as well as "equitable estoppel." (<u>See</u> Baiul-WMEE Opp. at 42.) These arguments are rejected.

"Under New York law, the statute of limitations for conversion . . . automatically begins to run against a bad faith possessor on the date of the theft or

bad faith acquisition—even if the true owner is unaware the chattel is missing."
Grosz v. Museum of Modern Art, 772, F. Supp. 2d. 473, 481-82 (S.D.N.Y. 2010)
(citing Close-Barzin v. Christie's, Inc., 857 N.Y.S.2d 545, 546 (N.Y. App. Div. 2008)).
On the other hand, "an innocent purchaser of stolen goods becomes a wrongdoer
only after refusing the owner's demand for their return."  Kunstsammlungen Zu
Weimar v. Elicofon, 678 F.2d 1150, 1161 (2d Cir. 1983).

Here, Baiul pleads that defendants' acquisition of the funds to which she was
entitled as a result of her performances and endorsements was itself unlawful; the
SAC repeatedly alleges that the checks and monies defendants are alleged to have
converted were "stolen."  (See SAC ¶¶ 482-89, 502-03, 505-06.)  Accordingly, the so-
called "demand-and-refusal rule" does not apply.  See Ferring B.V. v. Allergan, Inc.,
932 F. Supp. 2d 493, 510 (S.D.N.Y. 2013) (holding New York law conversion claims
barred by statute of limitations and the demand-and-refusal rule inapplicable
because plaintiff pled that the acquisition was unlawful).

With respect to equitable estoppel, for the reasons set forth above, Baiul is
unable to toll the statute of limitations on this basis because the SAC makes clear
that she has not exercised reasonable diligence in pursuing her claims during the
more than eleven years she seeks to toll.  As a result, Baiul's conversion claims are
untimely by more than ten years.

G.    Breach of Duty of Fair Representation (Count Eighteen)

Finally, Baiul alleges, against SAG only, breach of its duty of fair
representation ("DFR").  (See SAC ¶¶ 673-84.)  Baiul alleges that SAG acted in an

"arbitrary and/or discriminatory manner" towards her with respect to her

performances in A Promise Kept, the Nutcracker on Ice shows, and the Wizard of

Oz on Ice show.  (Id. ¶ 677.)  Baiul alleges that SAG failed to secure for her

compensation, pension contributions, welfare contributions, and residuals owed to

her for appearing in these productions (in 1994 and 1995).  (Id. ¶¶ 678, 680.)

     Under federal labor law, the statute of limitations for a DFR claim is six

months.  White v. White Rose Food, a Div. of DiGiorgio Corp., 128 F.3d 110, 114 (2d

Cir. 1997).  "In this circuit, it is well settled that the cause of action accrues no later

than the time when plaintiffs knew or reasonably should have known that such a

breach of the duty of fair representation had occurred, even if some possibility of

nonjudicial enforcement remained."  Kalyanaram v. Am. Ass'n of Univ. Professors

at N.Y. Inst. of Tech., Inc., 742 F.3d 42, 46 (2d Cir. 2014) (quoting Cohen v.

Flushing Hosp. & Med. Ctr., 68 F.3d 64, 67 (2d Cir. 1995)).

     Baiul argues that her DFR claim against SAG is timely because the

limitations period only began to run on June 28, 2013, when she discovered that "A

Promise Kept was actually a film that was required to pay residuals and in fact had

been paying residuals . . . but SAG took no action."  (SAC ¶ 683, Baiul-SAG Opp. at

12-13, ECF No. 149.)

     Even putting aside Baiul's general lack of reasonable diligence with respect

to the claims asserted in the SAC for eleven years—2000 up through late 2011—

there is no dispute that, as of November 2012, following months of investigation and

requests for documents by Farina, Baiul knew that (1) the four productions

described above were SAG productions; (2) none of the productions appeared on her EHR; and (3) compensation for the productions (including required SAG contributions and residuals) had been either diverted to others or withheld altogether. That Baiul did not know <u>additional</u> information about her potential DFR claim until June 28, 2013 (that others had been paid residuals for A Promise Kept) is of no moment—Baiul was on notice of the basis for her DFR claim by no later than November 2012. In November 2012, Baiul was 35 years old, had been living in the United States for nearly twenty years, had legal counsel,[13] and had already received numerous documents concerning her potential DFR claim. Accordingly, at the latest, the limitations period for Baiul's DFR claim against SAG expired in May 2013, nearly five months before the filing of the instant action.[14]

## V.   SANCTIONS

The SAG defendants seek sanctions under 28 U.S.C. § 1927 against Baiul's counsel for his failure to withdraw Baiul's time-barred DFR claim, even after receiving SAG's initial motion to dismiss the First Amended Complaint on this basis. (<u>See</u> SAG Mem. of Law at 24, ECF No. 135.)

---

[13] In fact, by this time, Baiul had already sued, <u>inter alia</u>, the WMEE Defendants in California Superior Court, Los Angeles County for, <u>inter alia</u>, failure to "account for or remit" numerous payments including "[e]arning royalties and/or residuals" from A Promise Kept, the Nutcracker on Ice shows, and the Wizard of Oz on Ice show. (<u>See</u> Vitale Decl. Ex. 1 ¶ 25, ECF No. 134.) This Court may take judicial notice of publicly filed documents like this complaint on this motion. <u>See</u> <u>Kramer v. Time Warner Inc.</u>, 937 F.2d 767, 773 (2d Cir. 1991).

[14] Though Baiul again argues that the issue of her due diligence is a question of fact that must be determined by a jury (<u>see</u> Baiul-SAG Opp. at 8-9), (1) this is not the law, <u>see</u> <u>Cohen</u>, 68 F.3d at 69; and (2) the cases upon which Baiul relies show that the issue of a plaintiff's diligence may be resolved on a motion to dismiss "[w]here the undisputed facts set forth in the complaint establish inquiry notice and the lack of due diligence," <u>Dietrich v. Bauer</u>, 76 F. Supp. 2d 312, 346 (S.D.N.Y. 1999) (internal quotation marks omitted) (citing <u>Butala</u>, 916 F. Supp. at 318).

Under 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. To impose sanctions under § 1927, "the trial court must find clear evidence that (1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes." Agee v. Paramount Commc'ns Inc., 114 F.3d 395, 398 (2d Cir. 1997). Sanctions under § 1927 require "a clear showing of bad faith on the part of an attorney." Salovaara v. Eckert, 222 F.3d 19, 35 (2d Cir. 2000). "Bad faith may be inferred only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." Id. (internal quotation marks and citation omitted).

Though the Court agrees that Baiul's claims against SAG (as well as against the other defendants) are entirely meritless because, inter alia, they are barred by the applicable statutes of limitations, the Court does not find that sanctions against Baiul's counsel are warranted under § 1927. First, § 1927 is for sanctions against attorneys, and it is not clear to the Court whether it is Baiul's counsel or Baiul herself who is responsible for the conduct at issue. Second, the Court notes that the extent to which these proceedings have been "multiplied" unreasonably and vexatiously is minimal, as this case is being dismissed at the pleading stage. Though, as noted supra, the filing of these clearly time-barred claims raises serious Rule 11 issues, defendants have not pursued sanctions on this basis. In the interest

26

of achieving finality with respect to this action, the Court declines to issue a Rule 11(c)(3) order directing Baiul's counsel to show cause as to why the filing of these claims does not violate Rule 11(b).

Accordingly, SAG's application for sanctions under § 1927 is DENIED.

VI.   LEAVE TO AMEND

In each of her oppositions, Baiul requests leave to amend the SAC pursuant to Rule 15(a)(2) should the Court grant any of defendants' motions to dismiss.

Rule 15(a)(2) provides that leave to amend "should be freely given when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "Leave to amend, though liberally granted, may properly be denied for: undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  Ruotolo v. City of N.Y., 514 F.3d 184, 191 (2d Cir. 2008) (internal quotation marks omitted) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).  "[I]t is within the sound discretion of the district court to grant or deny leave to amend."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007).

Baiul has already had the opportunity to amend her pleadings twice, the second time after the filing of motions to dismiss by certain defendants.  Though the SAC contains more than 700 paragraphs (including the prayers for relief) that span more than 120 pages, as well as nearly 140 pages of exhibits and affidavits from both Baiul and Farina, Baiul still fails to come close to alleging any timely claims

against the more than 20 defendants she has sued.  As a result, Baiul's request for leave to amend under Rule 15(a)(2) is DENIED, as any further amendment would be futile.  <u>See</u> <u>Becnel v. Deutsche Bank, AG</u>, 507 F. App'x 71, 73 (2d Cir. 2013) ("The district court did not err in concluding that such an amendment would be futile because appellants' claims would be time-barred even if such an amendment were allowed.")

VII.   CONCLUSION

For the reasons set forth above, defendants' motions to dismiss the SAC are GRANTED and this action is DISMISSED.  All dates and deadlines, including the initial pretrial conference scheduled for May 9, 2014, are adjourned.

The Clerk of Court is directed to close the motions at ECF Nos. 124, 130, 133, and 136.  The Clerk of Court is also directed to close this action.

SO ORDERED.

Dated:      New York, New York
            May _6_, 2014

                                        _____
                                        KATHERINE B. FORREST
                                        United States District Judge